## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LINDA G. BROWN,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 14 C 7199

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda G. Brown filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and have filed cross motions for summary judgment. For the reasons stated below, Plaintiff's motion is granted and the ALJ's decision is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB),[1] a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that

2d 973, 976-77 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 24, 2011, alleging that she became disabled on October 20, 2005. (R. at 119, 244–50). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 114–15, 119). On March 19, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 13–99, 119). Plaintiff's sister, Denise Lear, and Brian L. Harmon, a vocational expert (VE), also appeared and testified. (*Id.*).

The ALJ denied Plaintiff's request for benefits on May 28, 2013. (R. at 119–27). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity during the period of October 20, 2005, the alleged onset date, through June 30, 2010, her date last insured. (*Id.* at 121). At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, hypertension, osteoarthritis, and anxiety. (*Id.*). At step three, the ALJ first determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 121–22). The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that Plaintiff had the residual functional capacity to perform a range of light work, except "no ladders, ropes or scaffolds, no more than frequent handling, reaching, fingering and only

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

simple, routine, repetitive tasks." (*Id.* at 122). At step four, the ALJ concluded that Plaintiff could perform her past relevant work as an assembler as it was generally performed at the unskilled/light exertional level. (Id. at 126). Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined by the Act, at any time from October 20, 2005, the alleged onset date, through June 30, 2010, the date last insured. (Id. at 127).

The Appeals Council denied Plaintiff's request for review on January 29, 2014. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the

ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

Since 2002, Plaintiff has been a patient at Lake County Health Department and Community Health Center (Lake County), and was treated by Oana Nisipeanu, M.D. (R. at 565). On October 25, 2004, Plaintiff underwent a Pap smear at Lake County. (*Id.* at 472). It was noted that she had acid reflux and stomach ache, especially after eating greasy food. (*Id.*). It was also noted that she had a rash under both breasts and between her legs, and that she may have arthritis. (*Id.*). On December 6, 2004, Plaintiff followed up for a blood pressure check. (*Id.*). She complained about losing weight and fatigue. (*Id.*). She also complained of index finger pain and swelling. (*Id.*). She was prescribed hydrochlorothiazide (HCTZ) for her blood pressure.[3] (*Id.*) On December 13, 2004, Plaintiff followed up for her lab results. (*Id.* at 471). She commented that she hoped the doctor would prescribe her something for her arthritis and that she was under a lot of stress lately. (*Id.*). On a July 18, 2005 follow-up, it was noted that Plaintiff still had concerns about her weight loss, hot flashes, vaginal itching, and wanted to quit smoking. (*Id.* at 468). On September 10, 2005, Plaintiff complained of unusual side effects from her medicine. (*Id.* at 465).

On July 11, 2006, Dr. Nisipeanu met with Plaintiff and completed an indigent program enrollment application for Prozac, albuterol, and Zantac.[4] (R. at 464). On

---

[3] Hydrochlorothiazide is "a thiazide diuretic, used for treatment of hypertension and edema." *Dorland's Medical Dictionary* http://www.dorlands.com (last visited July 19, 2016) [hereinafter *Dorland's*].

[4] Prozac is a "trademark for preparations of fluoxetine hydrochloride," which is "used in the treatment of depression, obsessive-compulsive disorder, bulimia nervosa, and premen-

October 10, 2006, Plaintiff complained that the Zantac was not working and requested something for her hand and feet pain, and arthritis. (*Id.*). From January to June 2007, Plaintiff followed up about her blood pressure and general Pap smear. (*Id.* at 462–63). On June 28, 2007, Plaintiff requested Chantix; however, on July 3, 2007, she was given samples of Advicor because she could not afford Chantix.[5] (*Id.* at 461). From March 2008 through November 2009, Plaintiff again followed up about her blood pressure, a general Pap smear, and prescription refills, including naproxen.[6] (*Id.* at 453–61).

On April 23, 2010, Plaintiff followed up for her hypertension. (R. at 452). She complained about her weight loss, arthritis, and pain in her hands. (*Id.*). She took Aleve for her pain but did not want to take too much because of her stomach issues. (*Id.*). It was also noted that she had anxiety. (*Id.*). On June 22, 2010, Plaintiff followed up for her hypertension. (*Id.* at 451). She complained that her hands were really painful. (*Id.*). On July 30, 2010, Plaintiff followed up for her hypertension and again requested help to quit smoking. (*Id.* at 450). On April 5, 2011, Plaintiff com-

---

strual dysphoric disorder." *Dorland's*. Albuterol is "a ß-adrenergic agonist, specific for ß2-adrenergic receptors," which is used "for the treatment and prophylaxis of bronchospasm associated with bronchitis, pulmonary emphysema, or other chronic obstructive airway disease, the treatment of asthma-associated bronchospasm, and the prophylaxis of exercise-induced bronchospasm." *Id.* Zantac is a "trademark for preparations of ranitidine hydrochloride," which is "to inhibit gastric acid secretion in the prophylaxis and treatment of gastric and duodenal ulcer, gastroesophageal reflux disease, and conditions that cause gastric hypersecretion." *Id.*

[5] Chantix is a "trademark for a preparation of varenicline tartrate," which is "used as an aid in smoking cessation." *Dorland's*.

[6] Naproxen is "a nonsteroidal anti-inflammatory drug that is a propionic acid derivative, used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis, gout, calcium pyrophosphate deposition disease, fever, and dysmenorrhea and in the prophylaxis and suppression of vascular headache." *Dorland's*.

plained of bad depression, headaches, and that she was under a lot of stress. (*Id.* at 448). On April 21, 2011, Plaintiff's blood work revealed that it was consistent with diabetes. (*Id.* at 474).

On July 1, 2011, Plaintiff's sister Denise Lear completed a third party function report. (R. at 312–19). Lear indicated that Plaintiff's bilateral hand swelling, depression, anxiety, lack of social skills, and being withdrawn limited Plaintiff's ability to work. (*Id.* at 312). On July 5, 2011, Plaintiff completed a function report. (*Id.* at 300–10). Plaintiff indicated that her mental ability and hands swelling limited her ability to work. (*Id.* at 300). She also indicated that sometimes she slept, could not get out of bed, and cried all day due to stress. (*Id.*). Plaintiff indicated that when she wakes up, she prays for something good to happen for her; and then she gets up to make coffee and get dressed. (*Id.* at 301). If she is not stressing, then she takes a small walk and thereafter, reads the newspaper. (*Id.*). Sometimes, she takes care of her friend's dog by walking and feeding him. (*Id.*). Before her illnesses, she could work. (*Id.*). She noted that her sleep is affected by hot flashes, bad dreams, and worrying. (*Id.*) Plaintiff also has personal care problems dressing, bathing, and caring for her hair because she cannot hold up her arms for a long period. (*Id.*). She prepares her own meals daily, which consists of sandwiches, and a lot of frozen dinners and breakfast meals; it usually takes her about an hour. (*Id.* at 302). She also does not eat that much due to her illnesses. (*Id.*). She cleans for two and one half hours once per week, launders all day once per week, and makes her bed daily for about an hour. (*Id.*). Twice per week, she goes outside. (*Id.* at 303). She attends church

twice per week. (*Id.* at 304). She travels by car, riding as a passenger with others; and she is capable of going out alone and driving. (*Id.* at 303). Once per month, she shops for three hours for food and personal items. (*Id.*). She spends time with others at church, and once per month, she dines out with her friends. (*Id.*). She has problems getting along with others because they get on her nerves and she likes to be alone. (*Id.* at 305). Plaintiff indicated that her illnesses affect her lifting, bending, reaching, walking, hearing, memory, completing tasks, using hands, and getting along with others. (*Id.*). She also noted that she cannot hold onto things, her back hurts when she bends, she could not lift her arms for a long time, her ankles would hurt when she walked a lot, and when her ears rang, she was forgetful. (*Id.*). She can walk only three blocks before needing to stop and rest, and needs ten-minute rests between walks. (*Id.*). She can pay attention for four hours and can follow written and spoken instructions, and gets along with authority figures "good." (*Id.* at 305–06). She does not handle stress well, and is quiet when stressed. (*Id.* at 306). Plaintiff further indicated that her metformin and HCTZ made her use the restroom often, her enalapril gives her a slight headache, and her Xanax makes her sleepy.[7] (*Id.* at 307).

---

[7] Metformin hydrochloride is "a biguanide antihyperglycemic agent that potentiates the action of insulin, used in the treatment of type 2 diabetes mellitus. *Dorland's*. Enalapril is "an angiotensin-converting enzyme inhibitor with antihypertensive and vasodilator actions," which is "used in the treatment of hypertension, alone or in combination with a thiazide diuretic, congestive heart failure, and asymptomatic left ventricular dysfunction." *Id.* Xanax is a "trademark for a preparation of alprazolam," which is "used as an antianxiety agent in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms." *Id.*

On July 27, 2011, state agency consulting psychologist, David L. Biscardi, Ph.D., completed a Psychiatric Review Technique Form. (R. at 418–30). Dr. Biscardi concluded that there was insufficient evidence regarding Plaintiff's anxiety to determine her medical disposition and credibility. (*Id.* at 418, 430). On August 3, 2011, state agency consulting physician, Dr. Richard Bilinsky, M.D., completed an Illinois Request for Medical Advice. (*Id.* at 432–34). Dr. Bilinsky denied Plaintiff's claim for insufficient evidence prior to her date last insured. (*Id.* at 432). Dr. Bilinsky agreed with Dr. Biscardi that there was insufficient evidence to determine Plaintiff's claim and credibility. (*Id.* at 434).

From August 2011 to April 2012, Plaintiff continued to follow-up with Dr. Nisepeanu for her hypertension. (R. 534-38). She continued to complain of hand pain and was continually diagnosed with diabetes mellitus, hypertension, and anxiety. (*Id.*). On August 21, 2012, Plaintiff complained of tingling in her hands. (*Id.* at 532). She was diagnosed with peripheral neuropathy. (*Id.*). On August 28, 2012, Dr. Nisipeanu provided a letter on behalf of Plaintiff. (*Id.* at 565). Dr. Nisipeanu noted that since 2002, Plaintiff was a patient at the clinic and had been treated for diabetes, hyperlipidemia, hypertension, osteoarthritis, and anxiety. (*Id.*). Dr. Nisipeanu stated that although Plaintiff's diabetes was fairly well controlled, it caused her to experience peripheral neuropathy in her hands and feet, with symptoms of tingling and numbness. (*Id.*). Dr. Nisipeanu noted that the neuropathy together with Plaintiff's osteoarthritis affected her fine motor ability and caused her to have trouble gripping any tool or instrument. (*Id.*). Dr. Nisipeanu also noted that Plaintiff's hand

strength was decreased and that she could not stand or walk for any great length of time. (*Id.*). Dr. Nisipeanu opined that Plaintiff would have difficulty meeting the demands of most types of employment. (*Id.*).

On October 30, 2012, Dr. Nisipeanu completed a Physical RFC Questionnaire. (R. at 566–69). Dr. Nisipeanu indicated that she had attended Plaintiff every three to four months for ten years. (*Id.* at 566). Dr. Nisipeanu diagnosed diabetes mellitus, peripheral neuropathy, hypertension, and osteoarthritis, with a guarded prognosis. (*Id.*). Dr. Nisipeanu opined that Plaintiff's impairments lasted or could be expected to last at least 12 months and emotional factors contributed to her symptoms and functional limitations. (*Id.*). Plaintiff's symptoms include tingling and numbness in her hands and feet with anxiety and depression affecting her physical symptoms. (*Id.*) Plaintiff also has joint pain in her wrists that is triggered by excessive use of hands, and evidenced by decreased range of motion. (*Id.*). Dr. Nisipeanu indicated that Plaintiff was prescribed metformin, enalapril, HCTZ and Lyrica,[8] and that ordinarily, the medications do not have significant side effects. (*Id.*). Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described, and occasionally, during a typical workday, Plaintiff's experience of pain or other symptoms are severe enough to interfere with attention and concentration needed to perform even simple work tasks. (*Id.* at 567). Plaintiff can tolerate only up to moderate work stress. (*Id.*). She can sit for 20 minutes at one time before needing to stand, and can stand for only 10 minutes at one time before needing to

---

[8] Lyrica is a "trademark for a preparation of pregabalin," which is "used in the treatment of neuropathic pain in diabetic neuropathy and postherpetic neuralgia." *Dorland's*.

sit down, walk around, etc. (*Id.*). In total, Plaintiff is capable of sitting/standing/walking a total of only two hours in an eight-hour workday. (*Id.*). Plaintiff would need five additional periods to walk twenty minutes, and four or five, five to ten minute unscheduled breaks. (*Id.* at 567–68). With prolonged sitting, Plaintiff's legs would also need to be elevated above her midsection. (*Id.* at 568). Plaintiff is capable of rarely lifting less than 10 pounds and is never to lift 10 pounds or more. (*Id.*). She is never to look down or hold her head in a static position, and rarely, can turn her head right or left or look up. (*Id.*). She is never to twist, and rarely, could she stoop, crouch/squat, climb ladders, or climb stairs. (*Id.*). During an eight-hour workday, only 5% of the time can Plaintiff use her hands to grasp, turn, or twist objects, fingers to finely manipulate, and arms to reach, including overhead. (*Id.* at 569). Dr. Nisipeanu concluded that Plaintiff's impairments are likely to produce "good days" and "bad days" and that on average, as a result of her impairments or treatment, she would be absent from work more than four day per month. (*Id.*).

At the March 19, 2013 administrative hearing, Plaintiff testified that she was 59 years old, had an eleventh-grade education, lived with a friend, and had been brought to the hearing by her sister. (R. at 18–20, 24). Although she has a driver's license, she always receives a ride from someone. (*Id.* at 20). She has not worked since October 2009, and last worked as a babysitter. (*Id.* at 21). She would babysit three kids in her home. (*Id.*). She would watch the children five days per week, eight hours per day, making $14 per day. (*Id.* at 23). During the babysitting, she would have to lift about 50 pounds. (*Id.*). She stopped working because she almost dropped

a baby due to her hands swelling and giving out. (*Id.*). Before she babysat, she worked as a machine operator for 12½ years at Cherry Electric. (*Id.* at 25). During this job, she would lift up to 50 pounds. (*Id.*). She would sit for four hours and stand for four hours. (*Id.* at 26). Plaintiff testified that she was unable to work because of her hands and feet swelling and that she was left-handed and everything in the corporate world was basically for right-handed people. (*Id.*). She started having problems with her hands and feet in 2005. (*Id.*). At that time, she complained to Dr. Nisipeanu that her hands and feet were burning and tingling. (*Id.* at 27). The pain felt like she was walking on 1,000 needles and it burned. (*Id.* at 30). Dr. Nisipeanu prescribed her naproxen and Tylenol 3, and she was also taking Aleve for her pain. (*Id.*). She had side effects from the medication which caused her severe stomach aches due to her acid reflux. (*Id.*). Dr. Nisipeanu also told Plaintiff that she had diabetes neuropathy and referred her to a neurosurgeon. (*Id.* at 27–28). However, Plaintiff was unable to follow up because she did not have insurance or money and was unable to make an appointment. (*Id.* at 28). Between 2005 and 2009, Plaintiff's symptoms worsened (*Id.* at 29). She could sit comfortably no more than 20–25 minutes at one time. (*Id.*). She could not lift a half gallon of milk, and drank coffee out of a Styrofoam cup because ceramic cups were too heavy. (*Id.* at 30). She did not sleep through the night, due to her hands tingling and burning, and her hot flashes. (*Id.* at 30–32). She would wake up at 1:00 a.m. (*Id.* at 30–31). When she awoke, she used the restroom, made a cup of coffee, read the Bible, and then talked to her daughter at 7:30 a.m. (*Id.* at 31).

Every day, Plaintiff's daughter picked her up and would take her to her house. (R. at 31–33). Plaintiff's daughter also prepared breakfast for her, helped her clean, did the shopping, and helped wash her back. (*Id.* at 32, 38). Normally, Plaintiff returned home around 1:30/2:00 p.m. (*Id.*). Every Saturday, Plaintiff would see one of her sons and every Sunday, she would see two of her sons. (*Id.* at 33). They would come get her and take her to their homes to watch movies and have dinner. (*Id.*). Twice per week, she attended church. (*Id.* at 34). She took Aleve for her pain and metformin for her diabetes, enalapril for her blood pressure, Lyrica for her hand and feet pain, Zantac for her gastroesophageal reflux disease[9] (GERD), and Xanax for her anxiety and depression. (*Id.* at 34–35). She never had an EMG because she did not have insurance, and she saw her physician at Lake County through the indigent program. (*Id.* at 37).

Plaintiff's sister, Denise Lear, testified that she sees Plaintiff two or three times per week. (R. at 40–41). She sees her every Sunday and occasionally throughout the week, when she gets off work, she will go check on Plaintiff. (*Id.* at 41). On Mondays, Lear visits Plaintiff at home from 1:00/2:00 until 4:00 p.m.; Tuesdays she visits throughout the day; and Wednesdays, she visits around 12:00/1:00 p.m. (*Id.* at 41–43). Each time, Lear spends about three or four hours with Plaintiff. (*Id.* at 42–43). Lear testified that Plaintiff's daughter comes over to help Plaintiff, and that sometimes Plaintiff visits her daughter but not as much. (*Id.* at 43–44). Lear stated

---

[9] Gastroesophageal reflux disease is "any condition noted clinically or histopathologically that results from gastroesophageal reflux, ranging in seriousness from mild to life-threatening; principal characteristics are heartburn and regurgitation." *Dorland's*.

that since Plaintiff stopped working, she is kind of a recluse. (*Id.* at 45). They have a very large family, but Plaintiff does not have the stamina she used to have. (*Id.*). Plaintiff does not attend family gatherings, and she cannot dance or be active like before because she lacks the stamina. (*Id.* at 47). Plaintiff cannot decorate, lift or move things, or cook like she used to. (*Id.* at 46). Lear also stated that she had a stroke and at one time, Plaintiff was stronger than her, but not anymore. (*Id.*). Plaintiff cannot open jars, and has difficulties cooking, due to her knuckles swelling and hand discomfort. (*Id.* at 48).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because (1) her finding that Plaintiff's impairments do not equal a listing is contrary to the regulations, (2) she erroneously discounted the treating physician's opinion, and (3) her RFC assessment is based on a flawed credibility finding. (Mot. 4).

### A. Treating Physician Determination

Plaintiff began treating with Dr. Nisipeanu in 2002. (R. at 565). In October 2012, after seeing Plaintiff on a quarterly basis for over ten years, Dr. Nisipeanu completed a physical RFC assessment. (*Id.* at 566–69). He opined that because of peripheral neuropathy in her hands and feet with symptoms of tingling and numbness, Plaintiff is substantially impaired in her ability to perform many work-related functions. (*Id.*). The ALJ afforded Dr. Nisipeanu's opinion "little weight," finding that

there is very little regarding the diagnosis of peripheral neuropathy in the records including objective testing. Moreover, Dr. Nispieanu did not diagnose peripheral neuropathy until August 2012, well beyond the date last insured. The severe restrictions are not supported by Dr. Nisipeanu's own treatment notes, which are cursory with only intermittent notations of hand pain. There is no objective testing in the record indicating [Plaintiff] has tingling and/or peripheral neuropathy in her feet. The course of treatment pursued by the doctor has not been consistent with what one would expect if [Plaintiff] were truly as limited as the doctor has reported.

(*Id.* at 125–26) (citations omitted).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining phy-

sician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

Under the circumstances, the ALJ's decision to give little weight to Dr. Nisipeanu's opinion is legally insufficient and not supported by substantial evidence. First, Dr. Nisipeanu's opinion is consistent with his treatment notes. Peripheral neuropathy is "a name for peripheral nerve damage that causes symptoms ranging from numbness or tingling, to pricking sensations or muscle weakness." *Thomas v. Colvin*, 826 F.3d 953, 957–58 (7th Cir. 2016) (citation omitted); *see Thomas v. Colvin*, No. 13 C 3686, 2015 WL 515240, at *5 (N.D. Ill. Feb. 6, 2015) ("Peripheral neuropathy includes symptoms such as 'a tingling or burning feeling,' 'sharp, jabbing pain,' and 'pain when walking.'") (citing <www.mayoclinic.org/diseases–conditions/diabetic–neuropathy>). While Dr. Nispieanu may not have diagnosed peripheral neuropathy until August 2012, the tingling and numbness symptoms were present as early as 2006 through the date last insured. (R. at 464 (complaining of hand and feet pain in October 2006), 452 (complaining of pain in her hands in April 2010), 451 (complaining that her hands were very painful in June 2010)). Indeed, "in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e. be decided on medical grounds alone) before onset can be established." Social Security Ruling (SSR) 83-20, at * 2;[10] *see Bris-*

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally de-

*coe*, 425 F.3d at 353; *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) (holding that under SSR 83-20, the ALJ may not rely on the first date of diagnosis simply because an earlier diagnosis date is unavailable). Further, Plaintiff's peripheral neuropathy was caused by her diabetes (R. at 565), which the ALJ acknowledged as a severe impairment (*id.* at 121); *see* <www.mayoclinic.org/diseases-conditions/peripheral-neuropathy> ("More than half the people with diabetes develop some type of neuropathy.").

Second, Brown's "complaints of severe pain stemming from [her] neuropathy need not be confirmed by diagnostic tests." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015). Indeed, the ALJ may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, at *5; *see also Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (The ALJ's "principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays.").

Finally, the ALJ does not explain what *medical evidence* she relies upon to conclude that "[t]he course of treatment pursued by [Dr. Nisipeanu] has not been con-

---

fer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

sistent with what one would expect if [Plaintiff] were truly as limited as the doctor has reported." (R. at 126). In deciding what course of treatment would be appropriate for Plaintiff, "the ALJ was inappropriately 'playing doctor.'" *Engstrand*, 788 F.3d at 660–61; *see Goins v. Colvin,* 764 F.3d 677, 680 (7th Cir. 2014) (rejecting ALJ's interpretation of MRI results). "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon*, 763 F.3d at 722; *see Blakes ex rel. Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was in-consistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Nisipeanu's opinion. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinion.

## B. Symptom Evaluation Determination

Plaintiff contends that the ALJ erred in discounting her testimony about the nature and extent of her symptoms. (Mot. 12). The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2;[11] *see also* 20 C.F.R. § 404.1529. Second, once an underlying impairment capable of producing Plaintiff's symptoms is established, the ALJ evaluates "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities" SSR 16-3p, at *2. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)). Instead, both SSR 16-3p and its predecessor SSR 96-7p require

---

[11] With the recent issuance of SSR 16-3p, the Social Security administration has updated its guidance on evaluating symptoms in disability claims, eliminating the term "credibility" from its sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character. SSR 16-3p, 2016 WL 1119029 at *1 (effective March 16, 2016). While the new policy statement does apply to matters on appeal, the Court is also bound by case law concerning the same regulatory process under the "credibility" analysis of the former SSR 96-7p. *See Hagberg v. Colvin,* No. 14 C 887, 2016 WL 1660493, at *6–8 (N.D. Ill. Apr. 27, 2016); *Pietruszynski v. Colvin*, No. 14 C 2148, 2016 WL 1535158, at *6 & n.6 (N.D. Ill. Apr. 14, 2016).

the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she cannot work due to pain, burning, and numbness in her hands and feet. (R. at 23, 26). She cannot sleep through the night. (*Id.* at 30–32). She does no household chores and needs her daughter's help to perform routine personal care chores. She is unable to lift more than a few pounds. (*Id.* at 30). In her decision, the ALJ found that Plaintiff's allegations were "not credible." (*Id.* at 125). Specifically, the ALJ concluded that (1) Plaintiff engages in a broad range of activities of daily living, (2) there are inconsistences between Plaintiff's testimony and her sister's testimony, and (3) Plaintiff's treatment was routine and conservative. (*Id.*).

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, the ALJ failed to explain how Plaintiff being able to complete household chores equates to an ability to perform full-time work. While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly instructed that ALJs are not to place "undue weight" on those activities. *Moss*, 555 at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy*, 705 F.3d at 639.

Here, the ALJ did not adequately explain how Plaintiff's ability to perform limited household activities undermines her credibility of pain. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Even more concerning is that in discussing Plaintiff's daily activities, the ALJ misrepresented many of Plaintiff's limitations in performing those daily activities. With respect to babysitting, Plaintiff testified that she had to quit babysitting after she "almost dropped a baby." (R. at 23). She stated "[m]y hands gave—give out. They swell and I just

couldn't do it anymore." (*Id.*). *See Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) ("But an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time. . . . And the only activity of daily living to which the administrative law judge referred was babysitting, from which an ability to work full time could not be inferred.").

The ALJ also notes that Plaintiff "takes her friend's dog for a walk and feeds him, she prepares simple meals, cleans, does laundry and attends church twice a week, she reads and she visits with friends and family." (R. at 125). But these limited activities do not demonstrate that Plaintiff can perform full-time work. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ failed to consider the difference between a person being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week); *see also Moss*, 555 F.3d at 562 (noting the ALJ ignored numerous qualifications regarding Plaintiff's daily activities: "while washing dishes she shifts her weight to the left but still experiences pain; when she last went to the store she had to use the cart for support and was unable to stay long; and when she last tried to drive the family vehicle more than a year before the evidentiary hearing, she had difficulty pushing the pedals because of a lack of control or feeling in her foot"). Moreover, the ALJ did not consider that Plaintiff relies on family members to assist her in performing activities of daily living. Although Plaintiff is able to perform some household chores on her own, she relies on her daughter and sister to prepare meals, help her clean and shop, and wash her back. (R. at 32, 38, 42–43). The ALJ ignored these limita-

tions and did not consider how her ability to perform work activities would be similarly limited. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

Second, the ALJ exaggerated the differences between Plaintiff's testimony and her sister's statements. The ALJ emphasized that Plaintiff "testified that her daughter comes in in the morning and she spends the day at her daughter's home until her daughter takes her home about 1:30/2pm, when she goes to sleep because she cannot sleep at night. She naps from when she gets home until 1am." (R. at 125). Plaintiff's sister testified that she goes to Plaintiff's home and stays for 3–4 hours. (*Id.*). The ALJ concluded that this "would contradict [Plaintiff's] testimony that she sleeps daily from 1:00 pm–1:00 am at her home alone." (*Id.*). But whether the majority of the caretaking takes place in Plaintiff's home or her daughter's home is immaterial to Plaintiff's ability to work full time. It's clear from the testimony of both Plaintiff and her sister that Plaintiff's daughter is the primary caretaker in the morning and Plaintiff's sister is the primary caretaker in the afternoon. And there's no reason that Plaintiff could not be taking naps during the afternoon when her sister is visiting.

Finally, the ALJ's characterization that Plaintiff's treatment was routine and conservative is belied by the record. Beginning in 2004 and continuing through her date last insured, Plaintiff complained of multiple symptoms of hand and feet pain. (R. at 451–65, 471–72, 565). Dr. Nisipeanu, who had treated Plaintiff every three to four months beginning in 2002, diagnosed diabetes mellitus, peripheral neuropathy, hypertension and osteoarthritis, all with a guarded prognosis. (*Id.* at 565–66). While there may have been significant gaps in her treatment history, the ALJ failed to acknowledge that Plaintiff was indigent, did not have insurance, and was unable to make periodic appointments or afford her medications. (*Id.* at 28, 37, 464). An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Roddy,* 705 F.3d at 638 (citation omitted). If the ALJ believed that Brown's lapses in medication compliance damaged her testimony regarding the "intensity, persistence, and limiting effects" of her symptoms, the ALJ should have questioned Brown at the administrative hearing on this issue before discounting her credibility. SSR 16-3p, at *8–9 (The ALJ "may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider . . . [whether an] individual may not be able to afford treatment and may not have access to free or low-cost medical services."). Moreover, Plaintiff fre-

quently complained about side effects from her medications. (R. at 30, 307, 465). An ALJ must first explore the claimant's possible reasons for the lack of medical care before drawing a negative inference. SSR 16-3p. For instance, "possible reasons" an individual may not have pursued treatment include: "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." *Id.* at *9. An ALJ may not simply rely on a lack of treatment to find Plaintiff's allegations incredible. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## C. Other Issues

Because the Court is remanding to reevaluate Plaintiff's credibility and the weight to be given to Dr. Nisipeanu's opinion, the Court chooses not to address Plaintiff's other argument that the ALJ erred in her step three listing level analysis. However, on remand, after determining the weight to be given Dr. Nisipeanu's opinion and reevaluating Plaintiffs credibility, the ALJ shall reevaluate whether Plaintiff's combination of impairments meet or equal a listing. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. "In making a

proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [14] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: October 11, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge